**Slip Op. 07-119**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

```
ROYAL THAI GOVERNMENT, SAHAVIRIYA
STEEL INDUSTRIES PUBLIC COMPANY
LIMITED,                               Before: Richard W. Goldberg,
                                               Senior Judge
            Plaintiffs,
                                       Consol. Court No. 02-00026
                v.

UNITED STATES,

            Defendant,

                and

UNITED STATES STEEL CORP.,

            Defendant-
            Intervenor.
```

**OPINION**

[Commerce's remand results further remanded with instructions]

Date: August 6, 2007

Vinson & Elkins LLP (Kenneth J. Pierce, Robert Edward
DeFrancesco, and Victor S. Mroczka) for Plaintiffs the Royal Thai
Government and Sahaviriya Steel Industries Public Company
Limited.

Peter D. Keisler, Assistant Attorney General, David M. Cohen,
Director, Commercial Litigation Branch, Civil Division, United
States Department of Justice (Claudia Burke and David S.
Silverbrand); Mykhaylo A. Gryzlov, International Attorney-
Advisor, Office of the Chief Counsel for the Import
Administration, United States Department of Commerce, for
Defendant United States.

Skadden, Arps, Slate, Meagher & Flom LLP (John J. Mangan) for
Defendant-Intervenor United States Steel Corporation.

**Goldberg, Senior Judge**: This matter is before the Court following

a court-ordered remand on July 26, 2006.  See Royal Thai Gov't v.

United States, 30 CIT ___, 441 F. Supp. 2d 1350 (2006) ("Royal
Thai III").


I.    BACKGROUND


A.    Procedural History of This Case

In December 2000, Commerce initiated an investigation into
whether the Thai steel industry received various countervailable
subsidies.  See Certain Hot-Rolled Carbon Steel Flat Products
from Argentina, India, Indonesia, South Africa, and Thailand, 65
Fed. Reg. 77580 (Dep't Commerce Dec. 12, 2000) (notice of
initiation of countervailing duty investigation).  At the
conclusion of this investigation, Commerce determined inter alia
that the Royal Thai Government ("RTG") provided countervailable
subsidies to the Thai steel industry in the form of import duty
exemptions under Sections 30 and 36(1) of the Investment
Promotion Act of 1977 ("the duty exemption programs").  See
Certain Hot-Rolled Carbon Flat Products from Thailand, 66 Fed.
Reg. 50410 (Dep't Commerce Oct. 3, 2001) (final results of
countervailing duty investigation).  The duty exemption programs
permitted Thai steel manufacturers to import free of duty charges
raw materials consumed in production and raw materials
incorporated into goods for export.  See Issues and Decision
Memorandum in the Final Affirmative Countervailing Duty
Determination: Certain Hot-Rolled Carbon Steel Flat Products from
Thailand, C-549-818 (Sept. 21, 2001), Parts II.A.2 & II.A.3,

available at http://ia.ita.doc.gov/frn/summary/thailand/01-24753-1.txt ("Issues and Decision Mem."). Ultimately Commerce calculated the benefit from the duty exemption programs by using a 1% benchmark rate and found, respectively, 0.58 percent and 0.07 percent countervailable subsidy rates. See id.

Two court cases were filed challenging the final results of the investigations. These cases were later consolidated. In one case, Plaintiffs RTG and Sahaviriya Steel Industries Public Company Limited ("SSI") challenged Commerce's decision to countervail the entire amount of the duty exemption programs. Compl. ¶ 12 (Court No. 02-00027). In the other case, domestic party United States Steel Corp. ("U.S. Steel") objected to Commerce's use of the 1% tariff rate as a benchmark to measure the benefit from the duty exemption programs.[1] Compl. ¶ 13 (Court No. 02-00026). Specifically, U.S. Steel argued that the 1% rate was itself a countervailable subsidy and therefore an inappropriate benchmark. See U.S. Steel's Mem. Support Mot. J. Agency Record 43-44.

This Court ordered Commerce to reverse its decision to countervail the entire amount of the duty exemptions. See Royal Thai Gov't v. United States, 29 CIT ___, 341 F. Supp. 2d 1315 (2004) ("Royal Thai I"). As a result, U.S. Steel's argument relating to the benchmark was moot. See id., 29 CIT at ___, 341

---

[1] Other domestic parties jointly commenced this case with U.S. Steel, but at this point in the proceedings all other domestic plaintiffs have ceased involvement with the litigation and only U.S. Steel remains.

F. Supp. 2d at 1326.  The U.S. Court of Appeals for the Federal
Circuit ("Federal Circuit") reversed Royal Thai I's holding and
upheld Commerce's decision to countervail the entire amount.  See
Royal Thai Gov't v. United States, 436 F.3d 1330, 1337-41 (Fed.
Cir. 2006) ("Royal Thai II").

After Royal Thai II, the only thing remaining for this
Court to do with respect to the duty exemption programs was to
address U.S. Steel's challenge to the 1% benchmark.  Commerce
initially had found that since a 1% rate would have applied to
the steel slab imports, that 1% rate was the correct benchmark to
use.  See Issues and Decision Mem. Parts II.A.2 & II.A.3.  The
Court remanded that matter back to Commerce, explaining that the
countervailing duty laws required Commerce to use a non-
countervailable benchmark.  See Royal Thai III, 30 CIT at ___,
441 F. Supp. 2d at 1364-68.  The Court then instructed Commerce
to determine whether the 1% rate it had initially used in
calculating the benefit of the duty exemptions was itself a
countervailable subsidy.  See id., 30 CIT at ___, 441 F. Supp. 2d
at 1368.

**B.    Commerce's May 4, 2007 Remand Determination**

A component of countervailability analysis is specificity;
a subsidy is only countervailable if it is a specific subsidy.
See id. at 1366 (discussing 19 U.S.C. § 1677(5A)(D)'s de facto
specificity requirement).  A de facto specificity analysis will
require Commerce to examine the actual "use" of the subsidy and

the "amount" of the subsidy that various industries received.[2]

See 19 U.S.C. § 1677(5A)(D)(iii) (2000).  In order to compare the "use" and "amount" of the 1% rate across various Thai industries, the RTG claimed on remand that the specificity analysis should examine the relative benefits resulting from the 1% rate.  The RTG proposed that Commerce calculate the duty savings resulting from the 1% rate by subtracting the duties actually paid on merchandise subject to the 1% rate from what would have been paid otherwise.  The RTG proposed further that the "Normal" rates be used to calculate the import duties that would otherwise be due.  According to the nomenclature of the Thai tariff system, the "Normal" rates were higher than the "Reduced" rates.  See Verification Report 3-5.  During the period of investigation, steel slab had a 1% "Reduced" rate and a 10% "Normal" rate.  See RTG's Supp. Quest. Resp. 6.

Commerce rejected the RTG's proffered "relative benefit analysis," insisting that it was inappropriate to use the "Normal" rates as benchmarks in calculating the precise amount of benefits flowing from the 1% rate.[3]  See Results of

---

[2] A subsidy is specific under 19 U.S.C. § 1677(5A) if it is de facto or de jure specific.  No party to this litigation has ever argued that the 1% rate could be de jure specific.  Instead, the litigation has focused on whether the 1% rate is de facto specific.

[3] For sake of clarity, it may be helpful to provide some explanation of the two types of benchmarks at issue in this case.  First, Commerce must select a benchmark to calculate the economic value of the duty exemption programs.  Originally, Commerce had determined the 1% rate was an appropriate benchmark.  Second, the RTG sought to have Commerce consider the "Normal" rates as a

Redetermination on Remand Pursuant to Royal Thai Government, et
al. v. United States, Slip Op. 04-91 (Ct Int'l Trade July 27,
2004) (May 4, 2007) at 7 & 18-19 ("Remand Determination").[4]
Commerce explained that the "Normal" rates were unsuitable
benchmarks because the "Normal" rates in the Thai tariff system
"are not usually applied in assessing duties upon imports under
the vast majority of the HTS categories." Id. at 18.  Commerce
explained further that the RTG implemented "Normal" rates as part
of Thailand's negotiations with the WTO to fulfill its
obligations to cap its import duties at certain agreed-upon
levels.  Id.

     The Remand Determination reflects Commerce's understanding
that the "Normal" rates were generally used as a form of import
protection, and were only applied to imports competing with
domestic industries specifically targeted for protection.  Id. at
18-19.  According to Commerce, they served merely to memorialize
Thailand's GATT and WTO commitments in the Thai HTS and were
irrelevant for purposes of the actual assessment of duties for
the vast majority of HTS designations receiving the 1% rate.
Commerce reasoned that since the "Normal" rates would under no

---

benchmark to measure the benefits, if any, resulting from the 1%
rate itself, which was being examined for countervailability on
remand.

[4] The reference in the title of the Remand Determination to USCIT
Slip Opinion 04-91 is incorrect.  Commerce's Remand Determination
responded to the Court's order in USCIT Slip Opinion 06-117.

circumstances have been applied, it made no sense to use them as benchmarks.[5]

Instead, Commerce analyzed specificity by measuring the total CIF values[6] of imported merchandise under the various HTS subheadings receiving the 1% rate.  Relying on the data culled from the total CIF value analysis, it then made a twofold determination: (1) a group of industries including the steel industry was a predominant user of the 1% rate; and (2) the steel industry itself received a disproportionate amount of the benefits flowing from the 1% rate.  Id. at 6-8.  Since either one of these findings would necessitate a finding of specificity, Commerce then concluded that the 1% rate was a specific subsidy and therefore was not suitable as a benchmark to measure the benefits resulting from the importing duty exemption programs. Id. at 30-31.  Nowhere in the Remand Determination did Commerce present any analysis of why the 1% rate constitutes a subsidy. Finally, Commerce identified without explanation the 10% "Normal" rate as an acceptable benchmark and calculated the "estimated net countervailable subsidy rates under these [duty exemption]

---

[5] Commerce also considered alternative benchmarks, but ultimately rejected those as well.  See Remand Det. 7-8 & 19.  The RTG has never suggested that any alternative rates exist or would be appropriate benchmarks.  In fact, in its comments to the Remand Determination, the RTG states that "[t]here are no such 'alternative' reduced rates as claimed by [Commerce], nor would it be proper for [Commerce] to try to create them."  Pls.' Comments Dep't Commerce's Remand Results Pursuant to Slip Op. 06-117 at 8 ("Pls.' Br.").

[6] "CIF value" refers to the total price of an import shipment including (1) cost of the goods, (2) insurance, and (3) freight.

programs to be 5.85 percent and 0.91 percent, respectively." Id. at 31.

## II.   STANDARD OF REVIEW

The Court must sustain any determination, finding, or conclusion made by Commerce in the Remand Determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

With respect to the substantial evidence requirement, the U.S. Supreme Court has defined this term to mean "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938); accord Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 933 (Fed. Cir. 1984).

With respect to the in-accordance-with-law requirement, the Court must defer to an agency's reasonable construction of an ambiguous statute.  See Allegheny Ludlum Corp. v. United States, 367 F.3d 1339, 1343 (Fed. Cir. 2004) (citing Chevron U.S.A., Inc. v. NRDC, 467 U.S. 837, 843 (1984)).  Further, "the deference granted to the agency's interpretation of the statutes it administers extends to the methodology it applies to fulfill its statutory mandate."  GMN Georg Muller Nurnberg AG v. United States, 15 CIT 174, 178, 763 F. Supp. 607, 611 (1991) (citations omitted).

The segregation of the two standards of review (supported-by-substantial-evidence and in-accordance-with-law) serves to focus courts' attention on the dual agency function of legal interpretation and factual investigation.  Ultimately, the two standards of review are both iterations of the broad requirement that an agency must not act arbitrarily or capriciously.  See Bangor Hydro-Elec. Co. v. Fed. Energy Reg. Comm'n, 78 F.3d 659, 663 n.3 (D.C. Cir. 1996); accord Fujian Mach. and Equip. Imp. & Exp. Corp. v. United States, 178 F. Supp. 2d 1305, 1314, 25 CIT 1150, 1156 (2001).  An agency acts arbitrarily and capriciously when it fails to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1984) (quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962)).

## III.  DISCUSSION

### A.   Commerce's Treatment of the "Normal" Rates Must Be Internally Consistent

Countervailing duties are imposed on foreign products that are imported, sold, or likely to be sold in the United States, where the foreign government is directly or indirectly subsidizing the manufacture, production, or export of that merchandise.  See 19 U.S.C. § 1671(a); Kajaria Iron Castings Pvt. Ltd. v. United States, 156 F.3d 1163, 1165-66 (Fed. Cir. 1998).

The purpose of countervailing duties is to level the playing field in international trade by offsetting the unfair advantage that a foreign exporter receives through subsidies.  See Kajaria, 156 F.3d at 1166; Wolff Shoe Co. v. United States, 141 F.3d 1116, 1117 (Fed. Cir. 1998).

To achieve this purpose, Commerce must approximate the economic value that the foreign subsidy provides.  See Royal Thai III, 441 F. Supp. 2d at 1365.  In order to gauge the economic value of a countervailable import duty exemption, as in this case, Commerce must determine the tariff rate that the enterprise would have paid absent the duty exemption.  Id. at 1364.  It is difficult to measure the benefit conferred by a duty exemption because import tariffs are inherently government constructions, and so there is no "prevailing market rate" for Commerce to use as a benchmark.  Id. at 1365.  Nonetheless, Commerce's analysis must be aimed at ascertaining the economic value of the benefit conferred.

In its Remand Determination, Commerce used the 10% "Normal" rate as a benchmark to calculate the countervailable subsidy rate with respect to the duty exemption programs.  Earlier in that determination, though, Commerce had determined that looking to "Normal" rates was improper when analyzing the specificity of the allegedly countervailable 1% rate.  As noted in Part I.B, Commerce found that the "Normal" rates would not apply in the vast majority of cases.  In other words, Commerce has determined that the "Normal" rate is an appropriate benchmark to calculate

SSI's countervailable subsidy rate; but at the same time, and under the very same system of financial contribution, Commerce has determined that the "Normal" rates are not appropriate benchmarks to gauge the specificity of the 1% reduced tariff rate.

By using the "Normal" rate for steel slab, but rejecting the "Normal" rates for all other Thai industries, Commerce has created a distinction that requires explanation. See Gen. Chem. Corp. v. United States, 817 F.2d 844, 857 (D.C. Cir. 1987) (remanding agency determination where agency's internally inconsistent analysis was never explained). Commerce has provided no reason for treating steel slab imports differently than all other Thai industries receiving the 1% rate. Remand Det. 2, 18-19. Steel slab, like the "vast majority" of Thai industries, is not a vulnerable industry to which the "Normal" rate would likely apply. Verification Report 5. Nevertheless, Commerce applied the "Normal" rate to steel slab in reliance on the RTG's representation that the "Normal" rate would apply to steel slab in the absence of the 1% rate. Id. Without a formal notification from the Thai Ministry of Finance[7], all HTS tariff designations would receive the "Normal" rate by default. See Verification Report 5; RTG Resp. 21 (citing Exs. 9 & 10 in response to Question 4). So all merchandise — not just steel slab — would revert to their "Normal" rates if their applicable

---

[7] The Ministry of Finance could impose tariff rates lower than the "Normal" rates by means of ministerial promulgations, which are known as "MOF Notifications." See Verification Report 4.

reduced rates were suspended, or if the MOF notification for that rate expired.  Verification Report 5; RTG Resp. 21 (citing Exs. 9 & 10 in response to Question 4).  It is thus unclear why Commerce has decided to use steel slab's "Normal" rate to calculate the countervailing duty on SSI, but cannot use the "Normal" tariff rates to calculate the benefit conferred to Thai industries importing other merchandise at the 1% reduced tariff rate.

Commerce must decide whether the "Normal" tariff rates meaningfully relate to the economic value of the subsidy, or whether they are so irrelevant to the actual functioning of the Thai tariff regime that they must be excluded entirely from the benefit analysis.  It is clear that the Thai system of import tariffs is complex and technical; it is for Commerce, and not this Court, to make a supported determination regarding the use of the "Normal" rates as benchmarks.  See 19 U.S.C. §§ 1671d & 1677(1); 19 C.F.R. §§ 351.210 & 351.503(d) (2006).  But Commerce may not treat two like situations differently without explanation.  Cf. NSK Ltd. v. United States, 390 F.3d 1352, 1357-58 (Fed. Cir. 2004) (rejecting as internally inconsistent a Commerce regulation interpreting "the price used to establish export price" in antidumping law); Husteel Co., Ltd. v. Seah Steel Corp., Ltd., 31 CIT ___, ___, Slip Op. 07-74 at 18 (May 15, 2007) (applying the NSK holding to Commerce's findings in a single antidumping proceeding).

Defendant-intervenor U.S. Steel offers the following explanation for the apparently inconsistent determinations: "At

verification, RTG officials specifically stated with respect to slab, and only slab, that if the 1% reduced import duty rate was rescinded, the 'normal' rate of 10% would apply." Def.-Int. U.S. Steel Corp.'s Resp. Pl.'s Comments to Dep't Commerce Remand Det. 7 ("Def.-Int.'s Reply") (citing Verification Report 5). The cited Verification Report provides in pertinent part that:

> RTG officials explained that slab would have automatically reverted to its "Normal" rate of ten percent if these MOF Notifications had not been issued or had expired, since any "Reduced" rate other than one percent would require action on the part of the MOF to initiate and implement a new MOF Notification.

Verification Report 5. U.S. Steel is only half correct in its summation of this passage. While it is true that the passage can be read to support the proposition that the 10% "Normal" rate would apply to steel slab if the 1% rate were rescinded, Commerce addresses only steel slab in the passage, and never limits that analysis as applying "with respect to slab, and only slab." Def.-Int.'s Reply 7.

In fact, Commerce notes in the same paragraph that "RTG officials explained that an MOF Notification must be issued before a product can receive a 'Reduced' rate." Verification Report 5. Since steel slab was the only industry about which Commerce specifically inquired, Commerce only responded with respect to the steel industry. However, in formulating that response, the RTG was simply applying the general principle that since MOF Notifications alone operate to reduce tariff rates from the "Normal" rates, the "Normal" rate would have been the legally operative rate if no MOF Notification had ever implemented the 1%

reduced rate.   <u>See</u> Pls.' Br. 8-9 ("Indeed, [in the <u>Verification</u> <u>Report</u>] the Department verified that if [the] 1% rate was not available, the legally operative rate would be the normal rate clearly set forth in the tariff schedule.").   Thus, U.S. Steel correctly asserts that the "Normal" rate would be legally operative for slab, but incorrectly asserts that slab is unique in this regard.   Accordingly, the Court remands the issue so that Commerce may reconcile its findings regarding the applicability <u>vel</u> <u>non</u> of the "Normal" rates as benchmarks in Commerce's analysis.[8]   As it stands, the disparate treatment of the "Normal" rates is arbitrary.

**B.    Commerce Must Make Further Findings**

     A reconciliation of the inconsistency discussed in Part III.A will not complete Commerce's calculation of SSI's countervailable subsidy rate.   In this section, the Court will endeavor to explain the consequences of Commerce's adoption or rejection of the "Normal" rates as benchmarks, and delineate the additional findings that the Court will require as a result of Commerce's findings.

***1.    If the "Normal" Rates Are Meaningful Benchmarks, Then Commerce Must Revise Its Specificity Methodology.***

---

[8] Commerce itself has offered no explanation for its disparate treatment of the 10% "Normal" rate for steel slab and the "Normal" rates for other imported merchandise.

If Commerce determines that the "Normal" tariff rates are meaningful benchmarks then it must reverse its methodological decision to use CIF values instead of duty savings as a means of comparing the distribution of the 1% rate across industries. Otherwise, Commerce must explain its reasons for departing from its preferred policy.

As a preliminary matter, the deference due to Commerce's selected methodology is unaffected by the Federal Circuit's previous decision in Royal Thai II.  In Royal Thai II, the court granted Commerce latitude to measure the benefit conferred by a debt restructuring program.  See 436 F.3d at 1336.  The program, created in response to the Asian financial crisis of 1997, sought to identify major corporate debtors and offer a voluntary forum for restructuring negotiations that would bind all creditors. Royal Thai I, 29 CIT at ___, 341 F. Supp. 2d at 1317-18. Commerce determined that the program was non-specific by measuring the distribution of the value of the debts being restructured.  Royal Thai II, 436 F.3d at 1336.  The Federal Circuit recognized that more favorable terms would confer greater benefits, but ultimately did not require Commerce to inquire into the specific terms of each loan because acquiring that information was "impracticable."  Id.  Indeed, the RTG did not have access to the terms of the private loans.  Pls.' Br. 5.

In contrast, the current controversy is not over the practicability of conducting the proposed alternative analysis. The RTG has already provided the data necessary to analyze the

duty savings.  See RTG Resp., Ex. 9.  Rather, the parties
disagree over whether the "Normal" tariff rates provide a
meaningful benchmark against which the reduced 1% tariff rate may
be measured.  Royal Thai II thus has no bearing on the present
matter.  The issue is then whether Commerce, having found that
the "Normal" rates are appropriate benchmarks for the purposes of
calculating the countervailable subsidy rate, is compelled to use
the "Normal" rates in its specificity analysis, or if it may
continue to use the CIF values as a proxy for its proportional
benefit analysis.

        It is Commerce's own policy to use the relative level of
actual benefits conferred to various industries when conducting a
specificity analysis.  See Royal Thai II, 436 F.3d at 1336
("'[A]nalysis of whether an enterprise or industry or group
thereof is a dominant user of, or has received disproportionate
benefits under, a subsidy program should normally focus on the
level of benefits provided,' even if sometimes 'it may be
impracticable or impossible to determine the relative level of
benefits.'" (quoting Countervailing Duties: Final Rule, 63 Fed.
Reg. 65348, 65359 (Dep't Commerce Nov. 25, 1998) (final rule)).
As applied to the present controversy, the policy would require
Commerce to measure the actual savings provided by the import
tariff reduction, unless acquiring that information is
"impracticable."

        As explained above, it is not impracticable for Commerce to
incorporate the "Normal" rates into its specificity analysis.

Having determined that they are appropriate benchmarks to measure the economic value of the reduced tariff rate, Commerce must either follow its preferred policy of conducting a relative benefit analysis, or it must explain its departure from its own precedent.  See Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade, 412 U.S. 800, 808 (1973); Shakeproof Assembly Components Div. of Ill. Tool Works, Inc. v. United States, 29 CIT ___, ___, 412 F. Supp. 2d 1330, 1336 (2005); Allied Tube & Conduit Corp. v. United States, 29 CIT ___, ___, 374 F. Supp. 2d 1257, 1262 (2005) ("Commerce must explain why it chose to change its methodology and demonstrate that such change is in accordance with law and supported by substantial evidence.").

To be sure, the Court is mindful that it should not intrude into an agency's methodological prerogative without good reason. However, adopting the "Normal" rates as benchmarks in the specificity analysis will significantly transform the data and the conclusions that it may support.  If Commerce measures the benefit conferred on Thai industries by the RTG's "relative benefits analysis," the steel industry's share of the benefit drops considerably.  According to that analysis, the steel industry's share of the benefits flowing from the 1% reduced rate drops from 7.64 percent to 2.44 percent.  Remand Det. 8; Pls.' Br. 8.  The Court does not speculate as to whether Commerce will decide to group the steel industry with other industries to find predominant use, or whether Commerce will find disproportionate use despite steel's decreased proportion of benefits received.

However, it is clear that such a transformation of the benefit

distribution would merit further consideration from Commerce.

**2.    If the "Normal" Rates Are Not Meaningful Benchmarks, Then Commerce Must Prove That the 1% Reduced Tariff Rate Is a Subsidy.**

If Commerce determines that the "Normal" tariff rates are

_not_ meaningful benchmarks, then it will have rightfully excluded

them from its specificity analysis.  However, under a finding of

specificity alone, Commerce may not, as it has done here, discard

the 1% reduced rate as a benchmark.  Commerce must prove that the

1% reduced rate is a countervailable subsidy and it must do so

without reference to the rejected "Normal" rates.

A subsidy exists when "an authority . . . provides a

financial contribution . . . to a person and a benefit is thereby

conferred."  19 U.S.C. § 1677(5)(B).  As noted supra, such a

subsidy is countervailable only when it is specific.  See id.

§ 1677(5)(A).  There are thus three elements of a countervailable

subsidy: (1) financial contribution; (2) benefit conferred; and

(3) specificity.  See Delverde, SrL v. United States, 202 F.3d

1360, 1365 (Fed. Cir. 2000); 19 U.S.C. §§ 1677(5)(D) (defining

"financial contribution"), 1677(5)(E) (defining "benefit

conferred") & 1677(5A) (defining "specificity").

Commerce has not yet made any finding that the 1% tariff

rate is a subsidy, nor did this Court in Royal Thai III express

any opinion as to whether the 1% tariff met the other statutory

requirements of a countervailable subsidy.[9]  Thus, even if
Commerce finds specificity, it will have prematurely rejected the
1% rate as a benchmark if it does so without the requisite
finding that it is in fact a subsidy.

     The consequence of rejecting the "Normal" rates as
benchmarks, however, is that Commerce must then show that the 1%
rate confers a benefit without reference to these now irrelevant
"Normal" rates.  If the rates are not meaningful benchmarks, such
that their use would distort the specificity analysis, then any
calculations that result from their use will similarly distort
the calculation of SSI's countervailable subsidy.  And unless
Commerce can demonstrate that the 1% rate constitutes a benefit-
conferring financial contribution without reference to the
"Normal" tariff rates, it cannot find that the 1% rate is a
subsidy.  Finally, if Commerce is somehow able to prove that the
1% reduced tariff rate confers a countervailable benefit without
reference to the "Normal" rates, and accordingly rejects the 1%
rate as a benchmark, Commerce must then find a non-
countervailable benchmark that is not the "Normal" rate.

---

[9] In <u>Royal Thai III</u>, the Court included the following
qualification to its remand:

> Because the Court's discussion herein is necessarily
> limited to specificity analysis (i.e., the apparent
> basis for agency decision-making), the Court
> expresses no opinion on whether the other statutory criteria for
> establishing the existence of a countervailable
> subsidy (including the presence of a financial
> contribution) have otherwise been met in this case.

441 F. Supp. 2d at 1366 n.16.

## IV.   CONCLUSIONS

The Court holds that Commerce's disparate treatment of the "Normal" rates is unsupported and arbitrary.  Since the conclusions of the Remand Determination depended on that disparate treatment, the matter is remanded to the agency for reconsideration consistent with this opinion.  On remand, Commerce must make one of three findings: (1) determine that the "Normal" rates are meaningful benchmarks to determine the economic value of the benefit conferred by any import tariff rate reduction or exemption; (2) determine that the "Normal" rates are not meaningful benchmarks to determine the benefit conferred by the tariff rate reductions or exemptions; or (3) distinguish steel slab from other Thai industries that receive the 1% reduced rate, to show that steel slab's "Normal" tariff rate of 10% is a meaningful benchmark to calculate the benefit conferred by the tariff rate reductions or exemptions, but that the other Thai industries' "Normal" rates are not similarly meaningful benchmarks.  If Commerce makes the first finding, then it must accordingly adjust its specificity methodology or state its reasons for abandoning its precedent.  If Commerce makes the second finding, then Commerce must prove the existence of a subsidy without reference to the "Normal" tariff rates.  If, under this second finding, it cannot prove the existence of benefit, then it cannot prove that the reduced rate is a countervailable subsidy, and it must use the 1% tariff rate as a benchmark to calculate the countervailable subsidy that SSI

received through its import duty exemption programs.  If Commerce
makes the third finding, then it must make an affirmative finding
that that the 1% tariff rate is a subsidy, and use the 10% rate
to calculate SSI's countervailing duty.


/s/ Richard W. Goldberg
Richard W. Goldberg
Senior Judge

Dated:      August 6, 2007
            New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE

---

ROYAL THAI GOVERNMENT, SAHAVIRIYA
STEEL INDUSTRIES PUBLIC COMPANY
LIMITED,

            Plaintiffs,

            v.

UNITED STATES,

            Defendant,

            and

UNITED STATES STEEL CORP.,

            Defendant-
            Intervenor.

Before: Richard W. Goldberg,
       Senior Judge

Consol. Court No. 02-00026

---

## ORDER

    Upon consideration of the Results of Redetermination on Remand Pursuant to Royal Thai Government, et al. v. United States, Slip Op. 04-91 (Ct Int'l Trade July 27, 2004) (May 4, 2007) ("Remand Determination"), Plaintiffs' Comments on the Remand Results, and the Responses to Plaintiffs' Comments filed by the Defendant and the Defendant-Intervenor, and upon all other papers and proceedings had herein, and upon due deliberation, it is hereby

    **ORDERED** that the Remand Determination is further REMANDED to Commerce; and it is further

    **ORDERED** that on remand Commerce must make one of the following three findings based on substantial evidence:

    (1) The "Normal" rates are meaningful benchmarks to determine the economic value of the benefit conferred by any import tariff rate reduction or exemption;
    (2) The "Normal" rates are not meaningful benchmarks to determine the benefit conferred by the tariff rate reductions or exemptions; or
    (3) Steel slab may be distinguished from other Thai industries that receive the 1% reduced rate, such that steel slab's "Normal" tariff rate of 10% is a meaningful benchmark to calculate the benefit conferred by the tariff rate reductions or exemptions, but that the other Thai

industries' "Normal" rates are not similarly meaningful
benchmarks.
And it is further

   **ORDERED** that Commerce must consider and explain the
implications of the aforementioned findings as indicated in Part
IV of the Court's August 6, 2007 Slip Op. 07-119.

   **IT IS SO ORDERED.**

                                        /s/ Richard W. Goldberg
                                        Richard W. Goldberg
                                        Senior Judge

Dated:     August 6, 2007
           New York, New York

## NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____      By: _____
                                                              Deputy Clerk